No. 4097

Second Circuit

(Second Division)

## ODELL v. BABCOCK

(May 4, 1932. Opinion and Decree.)

John B. Files, of Shreveport, attorney for plaintiff, appellant.

T. Overton Brooks, of Shreveport, attorney for defendant, appellee.

TALIAFERRO, J. This suit involves the ownership of a Reo coupe automobile.

The facts appear to be that plaintiff ac-quired this car on account, from one who owed him, for the price of $1,900, and, having other cars, was anxious to dispose of the Reo for cash at the sacrifice price of $1,250. On or about June 6, 1930, one J. P. McIver learning of plaintiff's desire to dispose of the car, and of defendant's wish to purchase one, in the role of go-between or broker, brought the parties together in negotiations. The car was then delivered to defendant for purpose of demonstration and testing out for his own satisfaction, and he held possession of it for a few days, delivering it back to plaintiff or McIver. During the preliminary discussions between the parties, defendant informed plaintiff and McIver that he would trade common stock of the American Finance Corporation for the car, but plaintiff declined to consider this offer, but finally agreed to investigate the value of the stock. He did so, and learned through one of the banks of Shreveport that the stock was practically worthless. He also learned that the preferred stock of that company did have a value. It does not appear that plaintiff and defendant discussed the sale or trade for the car again until the evening of June 13th, but during the interval McIver, zealous to see the trade consummated and earn a commission, continued to act between the parties to prevent interest from lagging. On evening of June 13th defendant and McIver drove to plaintiff's residence, and there the trade was tentatively closed in the manner and under the conditions hereinafter mentioned. The stock was discussed at length, and, while plaintiff is not certain defendant mentioned preferred stock, he did say the stock had a value of $75 per share and dividends of 10 or 12 per cent had been declared on it; that some dividends had been deferred, but that the stock would come back on a dividend paying basis soon. Plaintiff stated that he did not want the stock, but wanted money,

for the car. The representations of defendant that influenced plaintiff at this conference on June 13th may best be seen from the following of plaintiff's testimony, viz.:

"He (referring to defendant) says, 'I guarantee you by the 15th of August to have your money for this stock.' Well I said, 'That is all right, that will be perfectly satisfactory to me.' He said, 'If you will keep it that long I am satisfied you will get at least Fifteen Hundred ($1500.00) Dollars for it.' So he went off with the car and the next day or two I went into it further and I went down to his office and had his secretary, he told her that he had sold me or delivered me or was going to deliver thirty (30) shares of the stock of the company. I still thought it was preferred. I didn't go into it any further. And I said, 'Well I don't want the stock issued or delivered to me because it is going to be sold anyway.' And I have never seen the stock, never a single share of it, neither preferred, common or any other part of it. So that was the sum and substance of the deal."

This evidence was objected to by defendant's counsel on the ground that it was not admissible under the pleadings. It was admitted as being relevant to the negotiations leading up to the sale of the car, but not to allow enlargement of pleadings.

Before the parties separated on this occasion plaintiff signed in duplicate an incomplete order or subscription for stock of said finance company, directed to defendant, on printed form used by the company, reading as follows: "I hereby purchase ............ shares of your No Par Common Stock in American Finance Corporation, purchase price $100.00 per share." This paper, when introduced in evidence, had been completed by defendant to read as follows: "I hereby purchase 30 shares of your No Par Common Stock in American Finance Company. Paid in full by Reo Coupe Flying Cloud Automobile, Serial #10505, Motor CA 102333."

There is dispute as to what was said by defendant to induce plaintiff to sign these papers. Plaintiff, corroborated by McIver, says that defendant suggested to plaintiff that he give him a specimen of his signature on a piece of paper for the use of the company in transferring his stock, but before this request could be complied with defendant took from his pocket the order or subscription blanks mentioned above, and suggested to plaintiff to affix his signature to each. Plaintiff admits he carried the orders from his porch into a lighted room and signed them, after noticing the paper called for purchase of stock. He states that he drew a line through the space used to write the number of shares being purchased or subscribed for. The car was then delivered to defendant, and he drove it from plaintiff's residence that night.

In keeping with the understanding to that effect, plaintiff on morning of June 14th appeared at the office of the American Finance Corporation to complete the trade, and, while he and defendant were discussing the matter, defendant called the company's secretary, and, in plaintiff's presence, handed her the papers he had signed the evening before, and requested her to issue stock to plaintiff as called for therein. Plaintiff demurred at the suggestion that the stock should be issued to him, stating that, as it would be sold very soon and the money paid over to him, he saw no necessity for such being done, but finally consented to the stock being issued in his name and authorized the secretary to hold it, which was done. Plaintiff never saw the stock certificate, nor had possession of it personally. He thought it called for preferred stock.

On July 1st plaintiff wrote defendant a letter which we quote in full:

"Dear Sir: Referring to our negotiations looking to the sale of a Reo Flying

Cloud and for which you proposed to pay thirty shares of stock in the American Finance Company, which you represented to be worth $75.00 per share. You were given the car to try out subject to my investigation of this stock.

"I find upon investigation there are two kinds of stock issued by your company: preferred and common. My understanding was that the stock you were to trade to me was preferred stock, which stock I find to be worth approximately the price you stated. I would under no condition accept the common stock, which has no par value and has not paid any dividends.

"If you will send me the preferred stock, I will execute the bill of sale; otherwise return the car to me and call the negotiation off."

Defendant did not comply with either request made in this letter, and on July 12th this suit was filed and service made on defendant.

Plaintiff takes the position that there was no sale of the car and that defendant is holding same illegally. In the alternative, he avers that, should it be held that there was a sale of the car for the stock, such sale should be decreed null and void because it was made through error superinduced by misrepresentations on part of defendant as to the value of the stock; and, further, in the alternative, should the court hold that there was a sale of the car, that the sale should be rescinded because there was no consideration for it, the stock being worthless. He further alleges that he had no knowledge of the value of the stock offered by defendant for the car, and relied entirely on the representations made by defendant that it was worth $75 per share, which was wholly untrue to the knowledge of defendant, who misrepresented its value to defraud petitioner.

Defendant, in answer to the petition, avers that he purchased the Reo car from plaintiff, delivering him 30 shares of the common stock of the American Finance Corporation therefor, and took possession of same as owner; that said stock did have a market value of approximately $75 per share; that, while he made no statement to plaintiff as to the actual value of the stock at time of sale, respondent does believe it to have a real and actual value, dependent upon the current economic conditions and the public demand for it.

On July 24th plaintiff filed supplemental petition and secured issuance of a writ of sequestration directing the sheriff of Caddo parish to seize the car in controversy, but, as it could not be found, the writ was never executed and the amended petition was not answered.

The lower court rejected plaintiff's demand and dismissed his suit. This appeal is prosecuted by him.

As affecting defendant's good faith and a lack of confidence in his title to the car, we have but to state some facts clearly established by the record. This suit was personally served on July 12th. Defendant testified that he drove the car to New Orleans on July 9th or 10th, and left that city on July 13th. He is undoubtedly in error as to the dates. He was in Shreveport on July 12th. That is certain. The inference arises that he drove the car away after being served with suit, and thereafter made it impossible for the court's processes to reach it. He stated he traded the car to a man in New Orleans, a stranger to him. His evidence on this score is far from being candid. If in good faith, he should have had no hesitancy in freely disclosing the facts.

The American Finance Corporation was organized in March, 1929. Its capital stock consisted of ten thousand shares of preferred stock of the par value of $100, and of five thousand shares of common stock

of no par value. Forty-seven hundred shares of the preferred stock and all of the common stock had been disposed of when this suit was tried. The common stock was transferred to three of the company's officers, one of whom being defendant, he being vice-president, for $1.00 per share. This was paid by services rendered in organizing and promoting the company. No dividends had been paid on this common stock, while a quarterly dividend of 2 per cent had been paid on the preferred stock. It appears that some of the common stock had been sold for $50 per share and possibly some for a larger price to unsuspecting persons, but such limited number of sales do not establish a market or fixed value for such stock. Whatever value the common stock had, or may have acquired, depended entirely upon the success of the company's business and earnings; and, having been in existence for only fifteen months when this controversy arose, it is inconceivable that this stock at that date could have acquired any real value as an investment. The money paid into the company's treasury was for the preferred stock. There was really no money or property of value back of the common stock to give it a value.

Notwithstanding his allegations to the contrary, plaintiff knew this common stock had no value. He had persistently, through the negotiations with defendant, declined to consider it on the price of the car. We do not believe he ever agreed to accept the stock for the car. Defendant, by employment of artful means, succeeded in inveigling plaintiff into a situation from which he believed plaintiff could not extricate himself and would be estopped from denying he had sold the car. Plaintiff was credulous, and relied upon defendant's promises and assurances. Defendant was anxious to secure possession of the car under semblance of title. His aim was to give plaintiff thirty shares of stock that he had recently acquired at $1 per share, and paid for in promotion services to the company, in order to have the car. Can it be supposed that plaintiff would have consented to part with his property for such price?

Defendant, in his efforts to completely tie plaintiff so he could not escape, and doubtless, too, out of lack of faith in the efficacy of the papers signed the night before, on the morning of June 14th, endeavored to get plaintiff to sign another application to purchase thirty shares of the no par common stock of the finance company, which plaintiff declined. This application is signed by defendant as salesman and is in the record. At the same time he endeavored to have plaintiff sign a written act of sale of the car to him, which was also refused. Failing in these efforts, defendant fell back on the blank order plaintiff had signed the evening before, which had been completely filled in to show purchase of the stock by plaintiff, and payment thereof made by delivery of the Reo car.

Our conclusion is, that plaintiff was only willing to dispose of his car to defendant on such terms as would insure the payment of the price in cash by August 15th following the negotiations in June, and that he was only willing to consider the preferred stock in exchange for the car, and, after learning that common stock had been issued to him, and knowing it had little or no value, he immediately called upon defendant to deliver the preferred stock to him or return the car. One of the elemental essentials to the consummation of the contract of sale or exchange, viz., agreement as to certainty of price, is lacking. Civ. Code, art. 2464. There was no consent on part of plaintiff to part with title to the car for the common stock, and with-

out such consent there could be no exchange. Civ. Code, arts. 2439, 2667. The minds of the parties at no time met as to what plaintiff was to receive in lieu of his car.

For the reasons herein assigned, the judgment of the lower court is reversed, annulled, and set aside; and there is now judgment in favor of plaintiff and against defendant recognizing him as owner of the Reo automobile in controversy and entitled to possession thereof, and that defendant pay all costs of court.